IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STRAWBERRY WATER USERS ASSOCIATION,<br><br>                    Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER GRANDING DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT FOR LACK OF JURISDICTION**<br><br>Case No. 2:22-cv-00002-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

This case arises from the Strawberry Water Users Association's ("SWUA") negligence and trespass action against the United States of America ("United States") under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 2671–2680. SWUA alleges that the United States, acting through the United States Department of Agriculture Forest Service ("Forest Service"), failed to adequately suppress two wildfires in 2018, the Bald Mountain Fire and the Pole Creek Fire, causing significant damage to SWUA's personal and real property interests.

Before the court is the United States' motion to dismiss for lack of jurisdiction. ECF No. 14. The United States contends that the court lacks jurisdiction due to the FTCA's discretionary function exception. The court held an in-person hearing regarding this motion on March 22, 2023. At the conclusion of the hearing, it took the motion under advisement. After considering the parties' written submissions and oral arguments, the court GRANTS the United States' motion to dismiss for lack of jurisdiction.

## BACKGROUND

### I.     PRE-FIRE PLANNING

In 1976, Congress enacted the National Forest Management Act ("NFMA"), which required the Forest Service to develop, maintain, and amend land and resource management plans ("Forest Plans") for each National Forest Land Unit ("Forest Unit").[1] 16 U.S.C. §§ 1600, *et seq.*; ECF No. 14-2 at ¶ 8. Forest Plans guide land and resource management decisions in each Forest Unit and provide the framework upon which fire management objectives and programs are developed and implemented. ECF No. 14-2 at ¶ 8. In 2003, Forest Service leadership approved Forest Plans for the Wasatch-Cache and Uinta National Forests.[2] *Id*. at ¶ 9. Each Forest's plan was developed and approved in compliance with the National Environmental Policy Act ("NEPA"), which requires federal agencies to analyze the environmental impact of major federal actions. *Id*. at ¶ 9; 42 U.S.C. § 4331, *et seq*. The NFMA requires the Forest Service to monitor conditions within each Forest Unit to determine if it needs to amend a Unit's Forest Plan. ECF No. 14-2 at ¶ 14. In its 2017 Biennial Monitoring Reporting, leadership of the Uinta-Wasatch-Cache ("UWC") National Forest determined that no amendment to the 2003 Uinta National Forest Plan was needed, and it has made none since 2003. *Id*.; ECF No. 14-5 at 1.

---

[1] A "Forest Unit" is a nationally significant classification of federally owned forest, range, and related lands that are administered by the Forest Service or designated for administration through the Forest Service.

[2] These two separate forests were later combined to form the Uinta-Wasatch-Cache National Forest in 2007. ECF No. 14-2 at ¶ 6. They maintain separate Forest Management Plans though they are now part of the same Forest Unit and managed collectively. *Id*. at ¶ 9.

As of 2018, the Uinta Forest Plan, which provides a framework for the management of the Mount Nebo area of the UWC National Forest, included the following guidelines for wildland fire use[3] in Wilderness Areas[4]:

> Guideline: Wildland fire use is allowed to reduce unnatural fuel accumulations and restore fire to its natural role when the following conditions exist:
> a. Reduction of available fuels and other conditions will promote attainment of a healthy wilderness ecosystem.
> b. Fire location does not constitute an unacceptable risk to resources or property outside the wilderness area.

ECF No. 14-2 at ¶ 21. The Plan also provides the following guidelines for wildland fire use in non-Wilderness Areas:

> Fire-3 Guideline: Wildland fire use is authorized forest-wide, except in high-use travel corridors, where there are susceptible known cultural resources, and where direction for certain management areas and management prescriptions provides otherwise. The appropriate response is suppression in high-use travel corridors or where there are susceptible known cultural resources. In areas authorized for wildland fire use, the full range of appropriate management responses, from full suppression to monitoring, may be used.

*Id*. at ¶ 21. The Uinta Forest Plan contains no provision for wildland fire use outside of the UWC National Forest.

In the spring of 2018, the UWC National Forest drafted and adopted a "Default Initial Fire Response Map," also known as "the Red/Green Map." ECF No. 14-13 at 6. The purpose of Red/Green Maps is to annually communicate to local stakeholders, including nearby communities and property owners, which "fire starts might be considered as a means to meet Forest Plan objectives" *Id*. Each Forest in the Intermountain Region is required to produce such a map "as a

---

[3] The term "Wildland Fire Use" was used by the Forest Service to describe the management of naturally ignited wildland fire to accomplish resource-management objectives in specific geographic areas outlined in fire management plans. It is no longer commonly used. ECF No. 14-2 at ¶ 22 n.3.

[4] "Wilderness Areas" are designated areas protected from human activity under the Wilderness Act of 1964. 16 U.S.C. §§ 1131, *et seq*.

consistent means to communicate intent and opportunity." *Id*. These maps are produced pursuant to the guidelines in the relevant Forest Plan and reflect the changing circumstances of the natural environment from year to year. *Id*. "An area marked in red indicates where fire is likely unwanted due to adjacent values. A green area might be evaluated for an approach that would lead to a larger fire footprint." *Id*. Updated Red/Green Maps are shared at spring meetings prior to the start of each fire season and can be amended based on input from local stakeholders. *Id*.

In addition to the fire management guidelines included in Forest Plans, the managers of Forest Units also rely upon the fire management guidelines laid out in national policy statements. In 2014, the Secretary of Agriculture and Secretary of the Interior jointly developed the National Cohesive Wildland Fire Management Strategy ("the National Strategy") to provide a consistent fire management regime for federal agencies operating across the country. ECF No. 19 at 41. The two secretaries drafted the National Strategy under a mandate from the Federal Land Assistance, Management, and Enhancement Act of 2009 (the "FLAME Act"). Pub. L. No. 111-88, 123 Stat. 2904, tit. V, § 501; 43 U.S.C. § 1748b(b)(1)-(7). The National Strategy was produced in recognition of the "rapid escalation of extreme wildfire behavior, accompanied by significant increases in risk to responders and citizens, home and property losses, costs, and threats to communities and landscapes" over the proceeding two decades and its vision, upon implementation, was to "[s]afely and effectively extinguish fires when needed; use fire where allowable; manage our national resources; and as a nation, to live with wildland fire." *National Cohesive Wildland Fire Management Strategy* at 1. To pursue its vision, the National Strategy included "a set of guidelines intended to provide basic direction when planning activities." *Id*. These guidelines were premised on four priorities:

> Safe and effective response to wildfires is the highest priority of the National Strategy, and includes enhancing wildfire response preparedness with an emphasis

on both structural protection and wildfire prevention to maximize the effectiveness of initial response. The second priority is vegetation and fuels management, and is perhaps the most challenging issue. General guidance in this area includes designing and prioritizing fuel treatments; strategically placing fuel treatments; increasing use of wildland fire for meeting resource objectives; and continuing and expanding the use of all methods to improve the resiliency of our forests and rangelands. The third priority involves engaging homeowners and communities in taking proactive action prior to wildfires. The fourth priority includes emphasizing programs and activities, tailored to meet identified local needs, which seek to prevent human-caused ignitions.

*Id*.

In 2015, the Forest Service adopted a five-year plan to effectuate the Secretaries' National Strategy: The USDA Forest Service Strategic Plan: FY 2015-2020 (the "National Plan"). ECF No. 19 at 42. The National Plan laid out the three components of the Forest Service's long-term fire management strategy: "(1) restoring fire-adapted ecosystems, (2) helping communities become safer when threatened by wildfire, and (3) responding appropriately to wildfire." *USDA Forest Service Strategic Plan: FY 2015-2020* at 12. In order to implement the components of the National Plan, the Forest Service would work "with landowners and other partners" to "restore the natural role of fire while helping at-risk communities adapt to wildfire hazards." *Id*. It would do so by promoting the idea of "shared responsibility for reducing fire risk to communities." *Id*. at 13.

## II.   THE FIRES

On August 24, 2018, lightning struck the steep and rugged terrain of the Mount Nebo Wilderness Area in the UWC National Forest, igniting the Bald Mountain Fire. The point of origination was well within a "green area" on the Red/Green Map, indicating that ignition took place in an area where an unplanned fire could "reduce fuel accumulations and contribute to landscape sustainability . . . when conditions [were] right to do so with little risk." ECF No. 14-13 at 6, 7. Initially, the fire grew slowly and the response from Forest Service fire managers matched its low intensity. After considering several factors, including firefighter safety, lack of values at

risk, the composition of surrounding vegetation, the remote location of the fire, and weather, the Forest Service published an Incident Decision on August 27, 2018. ECF No. 14-11. This report explained that managers planned to allow the Bald Mountain Fire to burn into unpopulated areas to the north, northeast, and east of its ignition point in order to "reduce unnatural fuel accumulations and restore fire to its natural role." ECF No. 12-11 at 13. The Forest Service's decision to put the fire "into monitor status," ECF No. 14-13 at 8, was, in part, a result of managers' belief that the "fire season and weather patterns indicate[d] favorable conditions for this incident to achieve resource benefits." *Id*. at 7. But resource management was not the only reason for allowing the Bald Mountain Fire to initially burn uncontrolled. The Fire's Zone Assistant Fire Management Officer/Duty Officer later maintained that "firefighter safety was the primary driver for [this] decision." ECF No. 14-13 at 8.

While fire managers did not actively attempt to suppress the fire in the Mount Nebo Wilderness Area, this did not mean that they intended to ignore potential threats to private property. The Forest Service's Initial Decision for the Bald Mountain Fire stated that it would "consider and allow suppression actions on the Southwest and Southern boundaries to prevent fire from reaching private lands and minimizing [sic] the need to close the Mona Pole road." ECF No. 12-11 at 17. Indeed, fire managers believed that "public access along the Mona Pole Road [was] critical." *Id*. at 20. As of September 5, 2018, the Bald Mountain Fire remained small, at only 5.5 acres in size, and was "creeping in timber." ECF No. 14-13 at 9. At this early stage, managers at the scene believed that it would not have a chance to "achieve much in the way of resource restoration before it went out." *Id*.

On September 6, 2018, lighting struck another remote area of the UWC National Forest, igniting the Pole Creek Fire. This fire initially burned an area 40 feet by 40 feet in size roughly six

miles to the southeast of the still smoldering Bald Mountain Fire. *Id*. Unlike the Bald Mountain Fire, the Pole Creek Fire began outside of a Wilderness Area. Like the Bald Mountain Fire, the Pole Creek Fire originated in a "green area" on the 2018 Red/Green Map. *Id*. at 10. On September 7, the Forest Service published an Incident Decision for the Pole Creek Fire. ECF No. 14-12. It explained that managers would use a "confine and contain" strategy to "minimize risk to firefighters while allowing fire to reduce fuels and enhance wildlife habitat." *Id*. at 14. These tactics would involve constructing fire lines and implementing burnout operations in order to avoid growth beyond the Fire's planning area, which was limited to a remote section of the UWC Forest.[5] *Id*. at 18. Fire managers stated that they would reconsider their strategies and switch to suppression if the fire grew beyond the planning area and began to pose a risk to roads and trails as "[r]esource benefits fires should not impact public use or public access." *Id*. At this initial stage, the Forest Service believed that "[t]he risk versus values, location, time of year, all indicated that this is a fire that [they] should not engage." ECF No. 14-13 at 10. "The fire was burning in an area where fire was not detrimental, a long way from values at risk." *Id*.

According to the Facilitated Learning Analysis on the Pole Creek and Bald Mountain Fires produced after managers extinguished the blazes, the Pole Creek Fire initially struggled to spread. ECF No. 14-13. Recent rains in the area had moistened the soil six to eight inches deep and only more wet weather was expected. The fire managers assigned to the Pole Creek Fire even harbored significant doubts that it could survive and become a suitable candidate for achieving desirable fuel reduction effects. Nevertheless, on September 7, fire crews "began line prep and scouting in case they needed to take action to contain the fire to [a] predefined 210-acre box."[6] *Id*. at 11. On

---

[5] A planning area represents the approximate area a wildfire is expected to influence in the foreseeable future. ECF No. 14-2 at ¶ 21.

[6] The box was the Pole Creek Fire's planning area.

September 8, this work continued "with crews building line down a west ridge off the Summit Trail," which was intended to serve as the main barrier to stop the possible advance of the Fire. *Id.* at 12. On September 9, the Pole Creek Fire continued to creep, yet only smoldered at half an acre in size. Crews began to "burn small jackpots of fuel" and conduct burns down the ridge to the main fire–seemingly in an attempt to help establish the Summit Trail fire line.[7] *Id.*

On September 10, management of the Pole Creek Fire became more difficult. First, the National Weather Service ("NWS") issued a Red Flag Warning for the area early that morning. While fire managers had expected wind to move into the region at some point, this weather event arrived earlier than expected. The NWS warned that crews could "expect to see gusts of 25 mph, increasing to 30+ mph . . . , and to expect increasingly stronger winds each of the next three days." *Id.* at 13. Second, due to high winds, construction of the fire line grew increasingly dangerous, as crews' ignitions on the eastern side of the fire became hot. So hot, in fact, that the Firing Boss made the crew "baby" the firing operation. *Id.* at 15. Managers pushed for the firing crew to speed up its work, but the Firing Boss refused and eventually ordered an end to firing operations because of the escalating risk of harm to his fire fighters. As he stated later, "I was not putting people in the saddle with fire below them." *Id.* Third, with wind increasing, the Pole Creek Fire rapidly ballooned in size. By the end of the day, the fire had grown to approximately 75 acres and "spotted" over the Summit Trail fire line. *Id.* at 16. Still, the Fire remained within its initial 210-acre planning area. In response to this growth, fire managers began assessing the need to introduce dozers and aircraft to contain the blaze.

---

[7] Plaintiff argues that during this early stage the Forest Service re-lit the Pole Creek Fire after it went out. While there is certainly evidence that the Forest Service started additional fires to create a fire line and to test fuels, there is no indication that the fire ignited by lightning on September 6 was ever fully extinguished.

On September 11, crews worked to establish new containment lines at Golden Ridge, Nebo Creek Road, and Pole Creek Road. *Id*. at 17. As a Red Flag Warning for wind continued, managers still debated whether to employ dozers to quickly build new perimeter lines. Ultimately, they decided to rely on additional crews to speed construction due to resource constraints. By the end of the day, the Pole Creek Fire was between 250 and 300 acres large. Meanwhile, the Bald Mountain Fire, which had not burned out, was beginning to grow. It now blackened 10 to 12 acres.

On September 12, both Fires rapidly grew, buoyed by a third Red Flag Day. At mid-morning, the Pole Creek Fire was between 500 and 600 acres in size, and the Bald Mountain Fire was between 20 and 30 acres in size. Crews struggled to prepare the fire lines necessary to fight these blazes. It was estimated that they had completed only 2% of the ten miles of fire lines needed to contain the Pole Creek Fire because managers had expected they would have a week before the Fire neared the edges of a newly established 5,000 to 6,000 acre containment area. That evening, the rapidity of both Fires' spread began to sink in. Crews worried that the Pole Creek Fire might reach Nebo Creek the next day and requested that a Forest Law Enforcement Officer ("LEO") begin evacuating grazing cattle and any individuals recreating in the area. At the fire management planning meeting that evening, a key state partner also began arguing for managers to switch from a "confine and contain" strategy to outright suppression of the Pole Creek Fire. *Id*. at 19. Managers decided not to change strategy at this juncture.

At 11:30 P.M., fire managers were shocked to hear that the Pole Creek Fire had suddenly made a five-mile run to Highway 89. One manager later stated that "I could hardly believe what I was hearing." *Id*. Forest LEOs and fire crews quickly began evacuating the community of Birdseye on the Highway and started looking for opportunities to directly fight the fire in the stubble fields behind the structures in the area. Managers also received word that the Bald Mountain and Pole

Creek Fires now had the potential to converge. It was at this point that their "mindsets changed to full suppression." *Id*.

Just after midnight on September 13, another day with a Red Flag Warning, the Bald Mountain Fire made a run and began threatening structures at an all-girl's camp. Fire crews successfully saved this property but were forced to evacuate from the fight because of wind speeds between 40 and 50 miles per hour. *Id*. at 19. Simultaneously, crews began to regain control of the Pole Creek Fire and slow its spread. Throughout the day, managers attempted to construct new lines and evacuated individuals who were threatened by the fires in the Woodland Hills and Elk Ridge communities. The Pole Creek Fire was now estimated at 1,500 acres and the Bald Mountain Fire was estimated at 1,800 acres. This explosion of fire activity was driven by winds that, according to the Public Information Officer attached to the incident, "were almost unnatural." *Id*. at 21.

As September 13 ended, command of both fires passed from the UWC National Forest and Manti-La Sal National Forest[8] supervisors to the Great Basin National Incident Management Team 1 via a Delegation of Authority and a Letter of Leader's Intent explaining the nature of the fires, "firefighter risk, incident objectives, and values at risk, along with expectations and operational procedures." *Id*. at 22. A Utah State official initially expressed concern with the contents of the Letter of Leader's Intent because it did not directly state that "full suppression" of the fire was an objective. *Id*. This was corrected on September 14 and in all subsequent Letters of Leader's Intent pertaining to both Fires. From September 14 onwards, fire crews gradually progressed in bringing

---

[8] A portion of the Manti-La Sal National Forest is located to the east of the Mount Nebo area of the UWC National Forest and separated from the UWC by Highway 89. It was impacted by the spread of the Pole Creek Fire.

the blazes under control even as Red Flag Warning days continued.[9] Both fires experienced their final days of growth on September 23, but only after burning nearly 100,000 acres of public and private land. *Id.*; ECF No. 13 at ¶ 64. In sum, small fires that managers believed they could contain for beneficial uses within planning areas on public lands grew out of control within the span of just a few days because of unexpected weather conditions. They jumped fire lines and threatened private property that fire crews desperately tried to save. Although managers eventually brought the Fires under control, they did so long after they had spread far beyond their expected range.

## LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(1), the burden of establishing subject-matter jurisdiction "rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). To establish jurisdiction, a plaintiff "must 'allege in [its] pleading the facts essential to show jurisdiction' and 'must support [those facts] by competent proof.'" *U.S. ex Rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 551 (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). "Where a party attacks the factual basis for subject matter jurisdiction, the court does not presume the truthfulness of factual allegations in the complaint." *La Resolana Architects, P.A. v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1198 (10th Cir. 2005) (citation and quotation omitted). Instead, it has "wide discretion to allow . . . other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). "[T]he determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues." *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997) (quotation omitted).

---

[9] Ten of the Eleven days from September 10 to September 20 were Red Flag Warning days. ECF No. 14-13 at 24.

This means that it may be impossible to determine whether the court has subject matter jurisdiction without resolving factual disputes. Accordingly, the court applies the Fed. R. Civ. P. 56 standard to this motion to dismiss and will analyze evidence outside of the complaint while "mak[ing] all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

**ANALYSIS**

## I.    THE FTCA AND DISCRETIONARY FUNCTION EXCEPTION

The United States maintains that this court has no jurisdiction over SWUA's negligence and trespass claims due to the United States' sovereign immunity. Although sovereign immunity generally bars Plaintiffs from bringing claims against the United States, this doctrine has several carveouts. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Most relevant here, when Congress enacted the FTCA in 1946 it waived portions of the federal government's immunity to allow plaintiffs to hold agencies liable for their tortious acts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. SWUA asserts its claims for damages under this waiver. But the FTCA contains several exceptions to its relinquishment of immunity. *See* 28 U.S.C. § 2680. This motion to dismiss revolves around whether one of these exceptions, the discretionary function exception, applies to the Forest Service's fire management decisions before and during the Bald Mountain and Pole Creek Fires.

The discretionary function exception establishes that, despite the general waiver of immunity to tort actions in the FTCA, the United States has not waived its immunity from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function . . . on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect

12

certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). "Because the discretionary function exception is jurisdictional, the burden is on [SWUA] to prove that it does not apply." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1220 (10th Cir. 2016) (citing *Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002)).

For SWUA to establish subject matter jurisdiction by showing that the discretionary function exception does not apply to its claim, it must meet the requirements of at least one of the two prongs of the test laid out by the Supreme Court in *Berkovitz v. United States*. 486 U.S. 531, 536-37 (1988). The *Berkovitz* test first allows plaintiffs to show that the discretionary function exception does not apply to their dispute because the action at issue was not "a matter of choice for the acting employee." *Id*. at 536. An acting employee lacks choice when a "federal statute, regulation, or policy specifically prescribe[d] a course of action for an employee to follow" and "the employee ha[d] no rightful option but to adhere to the directive." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Federal law bars application of the exception when legal standards are "both specific and mandatory," not when they are vague or optional. *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998).

Even if the government's conduct was discretionary, plaintiffs can still overcome the discretionary function exception by establishing the second prong of the *Berkovitz* test applies. This prong is triggered when "the discretionary action or decision [was not] based on considerations of public policy." *Hardscrabble Ranch*, 840 F.3d at 1220 (citing *Berkovitz*, 486 U.S. at 537). Government acts undertaken without the consideration of public policy are not the kind that the discretionary function exception was "designed to shield." *Berkovitz*, 486 U.S. at 536. This limitation on the exception is consistent with Congress's desire to pass a law targeted to

"prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984) (quotation marks omitted). But meeting the requirements of the public policy prong of the *Berkovitz* test is difficult. This is because "[w]hen established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991) "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*. at 325. In sum, the discretionary function exception "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 536.

## II.    APPLICATION OF *BERKOVITZ*

To meet its jurisdictional burden, SWUA attempts to demonstrate that the Forest Service's decision to employ the Bald Mountain and Pole Creek Fires for resource management purposes was not discretionary. SWUA argues that the Forest Service had "no rightful option" to delay suppression for two reasons. First, it maintains that Defendant had no legal authority to "impose a fire restoration management regime" on private and state lands not under its administration. ECF No. 19 at 4. Because the Forest Service had no authority to adopt such objectives, it also lacked discretion. Second, SWUA contends that the Forest Service lacked discretion to adopt and implement the 2018 Red/Green Map without performing an environmental review pursuant to the National Environmental Policy Act ("NEPA") and NFMA. The court addresses both arguments in

14

turn. Plaintiff does not dispute that the Forest Service exercised policy judgment in reaching its decisions, thus, the court will not address the second prong of the *Berkovitz* test.[10]

### 1. Decision to Burn Non-Forest Service Managed Land

When courts apply the first prong of the *Berkovitz* test, they "usually do not ponder the source of the government's discretion." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 39 (D.C. Cir. 2021). This is because FTCA cases "typically arise in contexts in which the government's authority to act is uncontroversial." *Id*. Yet here, SWUA argues that while the Forest Service had the discretion to manage fires, it lacked the legal authority, and thus discretion, to allow fires to burn non-Forest Service managed land. This court need not decide whether the discretionary function exception applies when an agency acts without authority because there is no evidence to indicate that the Forest Service intended to burn land outside the UWC National Forest.[11]

Several appellate courts have recognized that when an agency acts without statutory authority in the commission of a tort, a plaintiff meets the first prong of the *Berkovitz* test.[12] For instance, in *Medina v. United States*, the Fourth Circuit held that when "determine[ing] the bounds of the discretionary function exception . . . [courts] begin with the principle that federal officials

---

[10] The beginning of an argument on this point is contained in SWUA's amended complaint, but Plaintiff does not develop it further in its memorandum opposing Defendant's motion to dismiss for lack of jurisdiction. ECF No. 13 at ¶ 3. And the United States also adequately answers this nascent point in its memoranda. *See* ECF No. 14 at 18-20.

[11] Indeed, at the hearing on this motion, Plaintiff's counsel admitted that if SWUA could not show that it was the United States' intention to burn non-federally owned land then dismissal was appropriate.

[12] Plaintiff notes that "[a]t least eight . . . circuits, including the D.C., First, Second, Third, Fourth, Fifth, Eighth, and Ninth, 'have either held or stated in dictum that the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority.'" ECF No. 19 at 17 (citing *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016)). These holdings are not relevant to the case at hand as SWUA does not argue that the Forest Service's actions were unconstitutional.

do not possess discretion to violate constitutional rights or federal statutes." 259 F.3d 220, 225 (4th Cir. 2001) (internal quotation marks, alterations, and citations omitted). Similarly, in *Birnbaum v. United States*, the Second Circuit decided that an agency's actions "could not have been a 'discretionary act' if the [a]gency lacked authority to conduct such a program." 588 F.2d 319, 330 (2d Cir. 1978). This principle is derived from the logical idea that courts "need not ponder whether [the defendant's] discretion was taken away [because] it never existed in the first place." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 39-40 (D.C. Cir. 2021), *cert. denied*, 143 S. Ct. 395 (2022).[13]

The Tenth Circuit has yet to weigh in on the developing circuit split over whether the discretionary function exception applies when an agency acts beyond its authority. The closest it has come is its unpublished decision in *Martinez v. United States*. 822 F. App'x 671 (10th Cir. 2020). There, the court noted that "most circuits have held that conduct is not discretionary under the FTCA when it violates the Constitution," and explained that it had not yet addressed the issue. *Id.* at 678. The Tenth Circuit then declined to take up this open question of law because the *Martinez* plaintiff had not presented a persuasive argument that the government's actions were unconstitutional. *Id.* But even had the *Martinez* court decided whether *constitutional violations*

---

[13] At least two Circuits have held that *even unconstitutional actions* can be immunized from suit under the discretionary function exception. In *Kiiskila v. United States*, the Seventh Circuit sustained a dismissal of an FTCA claim because the underlying agency action was discretionary even though it was "constitutionally repugnant." 466 F.2d 626, 627–28 (7th Cir. 1972). The Eleventh Circuit also addressed this issue, noting that an "FTCA tort claim based on the government's tortious abuse of [a discretionary] function—even unconstitutional tortious abuse— is barred by the statutory discretionary function exception, as written and enacted." *Shivers v. United States*, 1 F.4th 924, 933 (11th Cir. 2021). The Eleventh Circuit reasoned that the discretionary function exception did not bar plaintiffs from obtaining a remedy to a constitutional harm, because while an FTCA suit was not the proper path for obtaining relief, *Bivens* provided an appropriate vehicle for obtaining a remedy. *Id.* (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

negated the discretionary-function exception, it would not have resolved whether the exception applies in a scenario when an agency lacks *statutory* authority. Fortunately, the court need not resolve this thorny question because it finds that the Forest Service never acted outside the confines of its authority to begin with.

SWUA argues that the Forest Service exceeded its statutory and discretionary authority by adopting a policy of "restoring fire" to private land through the USDA Forest Service Strategic Plan: FY 2015-2020 ("National Plan") and by implementing such a strategy in its management of the Bald Mountain and Pole Creek Fires. It maintains that neither the NFMA, nor any other statute, grants fire management authority over private lands. But the premise of Plaintiff's argument is deeply flawed. Neither the National Plan, nor the National Cohesive Wildland Fire Management Strategy (the "National Strategy") on which the National Plan is based, includes any suggestion that the Forest Service intended to burn "millions of acres of 'state, and private lands' outside the National Forests" because, as SWUA asserts, managers were "[n]ot satisfied with scorching National Forest lands."  ECF No. 19 at 7. In fact, the court finds no indication that the Forest Service has ever attempted to implement "a national strategy of purposefully using anticipated natural wildfire to immolate private and nonfederal public lands and communities, forcing upon them its vision for people beyond [National Forest] boundaries to 'live with wildland fire.'" *Id*. Going beyond written Forest Service policy, there is also no evidence that the Forest Service attempted to use Bald Mountain and Pole Creek Fires for fire management on private or state land, either pursuant to or in violation of the National Plan.

As an initial matter, the court admonishes SWUA's counsel for blatantly twisting the government's written policy statements to make the case that the Forest Service intended to burn non-National Forest lands. Take, for instance, SWUA's characterization of the National Plan. In

its memorandum, SWUA quotes and summarizes the National Plan as follows: "'Using the latest tools, we decide . . . when and where to *use fire* to achieve our objective for long-term ecosystem health and resilience' of lands regardless of ownership." *Id*. at 5 (emphasis in original). Note that SWUA adds an essential phrase at the end the end of the sentence. Neither the words "regardless of ownership," nor their substance, are found anywhere in the National Plan. It seems SWUA pulled these extra words from thin air to alter the National Plan's meaning.

The National Plan also states that "[b]y applying the best available science and land management and by working closely with *landowners* and other partners, we will restore the natural role of fire while helping *at-risk communities* adapt to wildfire hazards." *Id*. at 6 (emphasis in original). SWUA emphasizes the words "landowners" and "at-risk communities" to insinuate that the Forest Service is asserting authority over these entities and using naturally ignited fires to manage their lands through uncontrolled burns. The context surrounding this sentence makes it clear that the Forest Service's goal is merely to "[b]uild partnerships at all levels to reduce risk from wildfires" and "promote shared responsibility for reducing fire risk to communities." *USDA Forest Service Strategic Plan: FY 2015-2020* at 13. Far from urging government forest managers to unilaterally burn private land, the National Plan requires consensual collaboration between the Forest Service and non-federal actors.

SWUA's representations regarding the National Strategy are similarly misleading. SWUA asserts that "[t]he Strategy does not limit the Forest Service's use of wildland fire to federal lands," and that the "two fundamental goals of the Strategy is [sic] the creation of 'resilient landscapes' of all ownerships and what the Forest Service calls 'fire adapted communities.'" ECF No. 19 at 5. But SWUA's claim that the National Strategy does not limit the Forest Service's intentional use of wildland fire to federal lands is simply incorrect. The National Strategy clearly states that while

"[w]orking with state agencies that provide technical assistance to private landowners is key for wildfire control . . . management of the land still remains the landowners' purview." *National Cohesive Wildland Fire Management Strategy* at 71. In fact, the National Strategy recognizes that though one of its major goals is "fuel management on private land," this goal needed to be achieved, for instance, by "increasing the collaboration between actions taken on federal and private land, " *Id*. at 87, by increasing support for "federal conservation programs that provide assistance to achieve fuel management," *Id*., and by changing zoning to "require defensible space" or "fire-resistant construction," *Id*. at 88.

Similarly, SWUA's apparent suggestion that the creation of "resilient landscapes" involves burning private land is without merit. The National Strategy defines a resilient landscape as one that can "resist damage and recover quickly from disturbances." *Id*. at 91. Maintenance of these landscapes does not require non-consensual burns. Likewise, the fact that the National Strategy calls for "fire-adapted communities" does not mean that the Forest Service plans to burn non-federal land. The National Strategy defines "fire-adapted communities" as "human communities consisting of informed and prepared citizens collaboratively planning and taking action to safely co-exist with wildland fire." *Id*. In sum, the National Strategy urges communities to adapt to increasingly uncontrollable fires. It does not urge the federal government to let those fires run wild.[14]

---

[14] SWUA also attempts to twist the Chief of the Forest Service's words to argue that the Forest Service "asserted authority over the entire nation, not just the National Forests," for the purposes of fire management. ECF No. 19 at 6. On April 2, 2018, the Chief of the Forest Service stated that the Forest Service was "committed to the goals of the National Cohesive Wildland Fire Management Strategy, which seeks to create resilient landscapes, fire adapted communities and safe and effective wildfire response that bases decisions on risk analysis for *all ownerships*." ECF No. 19 at 44 (emphasis added by Plaintiff). The Chief of the Forest Service's anodyne words are just a restatement of the National Strategy's goal of collaborating with stakeholders to reduce fire

In addition to torturing the language of policy documents in an attempt to show that the United States wished to burn non-federal land, SWUA also suggests that, in practice, fire managers attempted to use the Bald Mountain and Pole Creek Fires to "achieve hazardous fuels reduction goals" outside the boundaries of the UWC National Forest. ECF No. 19 at 9. But there is no factual foundation for this assertion. Both fires were naturally ignited within the UWC National Forest in areas where the Uinta Forest plan authorized forest managers to use unplanned ignitions to meet resource-benefit objectives. ECF No. 13 at ¶¶ 37, 39. It is also clear that, from ignition onwards, fire managers prioritized stopping these fires from disrupting human activities and reaching private land. The Forest Service's Initial Decision for the Bald Mountain Fire stated that managers would "consider and allow suppression actions on the Southwest and Southern boundaries [of the planning area] to prevent fire from reaching private lands and minimizing the need to close the Mona Pole road." ECF No. 12-11 at 17. The Forest Service's Initial Decision for the Pole Creek Fire similarly specified that managers would employ a confine and control strategy, which involved constructing fire lines and implementing burnout operations in order to avoid growth of the Fire beyond its planning area in a remote area of the UWC National Forest. ECF No. 14-12 at 18. When the Fires suddenly exploded in size due to high winds on September 12 and 13, fire

---

risk and create healthier ecosystems. These words do not assert authority over management of private lands.

Similarly, SWUA uses the Chief of the Forest Service's words to suggest that the Forest Service intentionally allowed wildfires to burn millions of acres of private lands in 2018. SWUA quotes the Chief as stating that,

> Tools include mechanical treatments, prescribed fire, and unplanned fire in the right place at the right time. In 2018, the FS reduced hazardous fuels on 3.4 million acres of National Forest System, state, and private lands.

ECF No. 19 at 7 (citing *USDA Forest Service (FS) 2019 Fire Year Key Messages*). But this quote does nothing to explain whether the Forest Service intentionally burned private and state land *without permission*.

managers were shocked and immediately jumped into action to protect threatened private property. ECF No. 14-13 at 19. While the Bald Mountain and Pole Creek Fires may have been managed in such a way that private property was impacted, this does not mean that their spread was the result of the Forest Service's intentional decision to clear private land of fuel.

Ultimately, there is no genuine dispute of material fact as to whether the Forest Service imposed either a local or national fire restoration regime on non-federal lands. SWUA's assertions otherwise do not comport with the relevant written fire management policies. They also conflict with all the evidence presented to this court regarding fire managers' conduct as they sought to harness the power of, and then fought to suppress, the Bald Mountain and Pole Creek Fires. The court is left with a factual scenario similar to that in cases in which a plaintiff alleges fire mismanagement. In those cases, courts apply the discretionary function exception without fail. *See, e.g., Hardscrabble Ranch L.L.C.*, 840 F.3d 1216 (holding that the discretionary function exception applies to claims alleging the Forest Service mismanaged a fire on its land by attempting to accomplish resource management goals.); *4Sees v. United States*, 2:16-cv-00695-JNP-CMR, 2020 WL 5495183, at *10 (D. Utah Sept. 9, 2020) (unpublished) (holding that the exception applies to claims alleging the Bureau of Land Management mismanaged a fire on its lands.).

### 2. Decision to Adopt and Implement the 2018 Red/Green Map

Having failed to meet its burden to offer evidence that the Forest Service acted outside its statutory authority by allegedly burning non-federal lands, SWUA attempts to meet its *Berkovitz* burden by showing that the Forest Service had no authority to adopt and implement the 2018 Red/Green Map—a map that communicated the Forest Service's intention to allow the UWC land surrounding the Fires' ignition points to burn for resource management purposes. SWUA maintains that the Forest Service failed to take a mandatory course of action in adopting the Red/Green Map because it did not conduct a NEPA analysis prior to the Map's finalization. If it

is true that the Forest Service ignored a statutory obligation to undergo a mandatory environmental review, SWUA contends that that discretionary function exception does not apply to its claims for trespass and negligence.

The court, however, need not analyze the Forest's Service's obligations under NEPA and the NFMA because the FTCA is not the appropriate channel for challenges to an agency's peculiarly administrative actions. A foundational tenant of the FTCA's waiver of sovereign immunity is that the waiver "is limited to conduct for which a private person could be held liable under state tort law." *United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999) (citing 28 U.S.C. §§ 1346(b), 2674). The flipside of this principle is that parties may not challenge "federal statutory duties regarding peculiarly administrative acts" under the FTCA because they "generally involve 'a type of conduct that private persons could not engage in, and hence could not be liable for under local law.'" *Id.* (citing *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997) (quotation omitted). The reason for the distinction between actions for which a "private person could be held liable" and that "private persons could not engage in," is Congress's desire to maintain the efficient and orderly function of government. As the Tenth Circuit has observed, "Given the potential commercial impact of virtually all government regulation, holding the FTCA available to any persons or entities aggrieved in their business by administration action would result in wholesale collateral second-guessing of federal regulatory activity—and under state tort law unconstrained by the comprehensive (APA) scheme Congress designed for the task of administrative review." *Agronics Inc.*, 164 F.3d at 1346.

Here, the adoption and implementation of the 2018 Red/Green Map is exactly the sort of "peculiarly administrative act" or "quasi-legislative procedure[] of a government agency [that] should [not] be policed according to local law." *Id.*; *see also Kikumura v. Osagie*, 461 F.3d 1269,

1300 (10th Cir. 2006) ("Our holding in *Agronics* is limited to government actors engaged in 'quasi-legislative' or 'quasi-judicial' action."). It is one thing to say that the Forest Service's decision to purposefully or negligently allow a fire to burn onto private lands is conduct for which a private person could be held liable under state law; it is another to say that the Forest Service's procedural mistakes in adopting and implementing a land management plan that, absent those mistakes, was within its substantive statutory authority, is susceptible to an FTCA challenge. In the first scenario, a plaintiff's claim is based on an underlying state tort (trespass and negligence). In the second scenario, a plaintiff's claim is based entirely on failure to comply with NEPA and the NFMA—laws that create relevant obligations only for the federal government. The NEPA argument before the court involves no state tort claim, it involves a federal procedural claim.

Although the Forest Service's potential violation of NEPA and the NFMA cannot give rise to a claim under the FTCA, it is essential to note that SWUA may not be fully foreclosed from challenging the Agency's adoption of the 2018 Red/Green Map. NEPA and the NFMA do not provide a private right of action, but SWUA might be able to bring suit under the APA, which waives the government's immunity to challenges to final agency actions under those statutes.[15] *Utah Env'l Cong. v. Troyer*, 479 F.3d 1269, 1279 (10th Cir. 2007). Importantly, however, the APA does not allow parties affected by an adverse agency decision to "collect damages from the government." *Agronics Inc.*, 164 F.3d at 1346 (quoting *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 392). The APA's lack of provision for damages highlights why this court must closely police the boundaries between FTCA and APA claims. Under the FTCA, Congress wished to provide "damage actions as an additional means of policing the internal procedures of government

---

[15] The court does not take a position on whether an APA claim is viable given the facts of this particular case or the body of administrative law. To delve into such an analysis is beyond the purview of this memorandum decision.

agencies." *Id*. Yet, it recognized that if damages were allowed in cases challenging peculiarly administrative actions, "absurd" outcomes would arise. *Agronics Inc.*, 164 F.3d at 1346-47 (quoting *Jayvee Brand, Inc. v. United States*, 721 F.2d at 393). Specifically, Congress worried that if damages were extended to cases challenging this class of peculiarly administrative agency actions through a broad FTCA, crucial agency decisions would improperly "be held subject to damage liability according to the tort law of whatever state or municipality a federal agency happens to be in when it acts." *Id*. In accordance with the FTCA's clear text and Congress's intent, the court finds that it does not have jurisdiction over SWUA's claim for damages arising from the Forest Service's alleged failure to comply with NEPA and the NFMA when adopting the 2018 Red/Green Map. The court will not give SWUA a backdoor to collect damages for what amounts, at most, to a potential APA claim.

Even if SWUA could establish that the adoption and implementation of the 2018 Red/Green Map was the sort of conduct for which a plaintiff could hold a private person liable under state tort law, SWUA would still fail to establish jurisdiction because the Forest Service acted within the limits of its *substantive* authority. SWUA argues that the Forest Service cannot access the discretionary function exception because it had "no rightful option" to ignore its procedural obligation to perform an environmental review of the 2018 Red/Green Map under NEPA before its adoption. NEPA requires an environmental analysis of projects when "the federal government's involvement in [the] project is sufficient to constitute 'major federal action.'" *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 (10th Cir. 1990) (quoting 42 U.S.C. § 4332(C)). This requirement has two aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns

in its decisionmaking process." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010). While NEPA requires agencies to make findings, it is "strictly a procedural statute; it does not mandate substantive results." *Id.* (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008). In other words, once an environmental analysis is completed, agencies are free to act as they so choose so long as they act within the discretion granted by substantive sources of law.

In a closely analogous case, the Fifth Circuit used the distinction between actions constrained by *substantive* and *procedural* law to determine that the discretionary function exception granted the Army Corps of Engineers immunity from a lawsuit claiming damages in the wake of Hurricane Katrina even though the agency had failed to comply with NEPA when it engaged in the challenged actions.[16] *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 450 (5th Cir. 2012). The court assumed, for the sake of argument, that the Army Corps of Engineers had indeed violated NEPA. *Id.* Nevertheless, it held that this was irrelevant to the question of liability because it was "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* (citing *City of Shoreacres v. Waterworth*, 420 F.3d 440, 450 (5th Cir. 2005)). According to the Fifth Circuit, "[a]t most, the Corps ha[d] abused its discretion."

---

[16] SWUA attempts to distinguish this case from *In re Katrina Canal Breaches Litig.* by arguing that, in Louisiana, the Army Corps of Engineers exercised some discretion by at least drafting an Environmental Impact Statement ("EIS"), albeit a flawed one. But this distinction is immaterial to the holding of *In re Katrina*, which focused solely on the difference between substantive and procedural requirements, as opposed to whether an agency partially or fully ignored a procedural requirement. *In re Katrina Canal Breaches Litig.*, 696 F.3d at 450. SWUA also cites *Utahns for Better Transp. v. U.S. Dep't of Transp.* to argue that, because it was "mandatory" for the Forest Service to consult NEPA when it took action, the discretionary function exception does not apply. 305 F.3d 1152, 1162 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003). But the quotation SWUA employees for this proposition is a simple restatement of the undisputed fact that NEPA requires an EIS for major policy changes. *Id.* SWUA neglects to mention that the decision also states the foundational principle of *In re Katrina* that "NEPA prescribes the necessary process, but does not mandate particular results." *Id.*

25

*In re Katrina Canal Breaches Litig.*, 696 F.3d at 450. If the Corps had only abused its discretion, the discretionary function exception had to apply to its actions because abuses of discretion are "explicitly immunized" by the exception. *Id.*; *see* 28 U.S.C. § 2680(a) (excepting discretionary action from liability "whether or not the discretion involved be abused.")

While caselaw from outside the Tenth Circuit is not binding in the District of Utah, this court is persuaded by the Fifth Circuit's reasoning and applies it to the case at hand. It is undisputed that under the NFMA the Forest Service had the authority to create a Forest Management Plan for the Uinta Unit of the UWC National Forest and that it had the authority to change the way it implemented the Plan based on findings from forest monitoring, including by creating the 2018 Red/Green Map in exactly the form that it was implemented. *See* ECF No. 19 at 21. To hold the Forest Service liable for *improperly exercising* the *discretion it undoubtedly possessed* via the NFMA would defeat the purpose of the discretionary function exception. Under § 706(2)(A) of the APA, parties can challenge agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If SWUA wants to contest the process by which the Forest Service creates its fire management regime, using the APA is a more appropriate vehicle than shoehorning an administrative law argument into an FTCA case. In sum, Plaintiff cannot meet its burden to show that the Forest Service's decision to adopt and implement the 2018 Red/Green Map was not "a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536-37.

## CONCLUSION

For the aforementioned reasons, the court GRANTS the United States' motion to dismiss for lack of jurisdiction.

DATED March 24, 2023

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge